THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CHARLES CHESSMAN, Appellant.

Second Department, June 16, 1980

### APPEARANCES OF COUNSEL

*Matthew Muraskin (Michael J. Obus* of counsel), for appellant.

*Denis Dillon, District Attorney (Martin I. Saperstein* and *William C. Donnino* of counsel), for respondent.

### OPINION OF THE COURT

GIBBONS, J.

The defendant stands convicted of the crime of robbery in the third degree which arises out of the taking of a pocketbook from Lena Newhook who was 81 years of age at the time of the occurrence.

By an indictment dated November 17, 1977, the defendant was charged with the crime of robbery in the third degree under the first count, grand larceny in the third degree under the second count, and petit larceny under the third count.

Briefly stated, the facts show that on October 31, 1977, Mrs. Newhook and her daughter, Mary Eileen, had been shopping at Modell's Shopping Center in East Meadow, New York. After they had completed their shopping, at about 2:20 P.M., they returned to the parking lot where Mary Eileen had parked her car. After Mary Eileen had opened the car trunk, and as Mrs. Newhook was giving her several packages to put into the trunk, Mrs. Newhook's pocketbook, which she was holding in her right hand, was taken from her.

In describing the incident Mrs. Newhook testified on direct examination that the pocketbook, which she was holding by the straps, was taken before she was pushed or knocked to the ground.

Her testimony was as follows:

"A I had my pocketbook in my hand.

"Q What were you holding it by?

"A What's that?

"Q Did you have it by the straps?

"A Yes.

"Q Now you indicated that you were pushed or knocked to the ground, is that correct?

"A Yes, that's right. And the pocketbook was taken.

"Q Was the pocketbook taken as you were being pushed to the ground or after you were pushed?

"A *Before* I was pushed to the ground, the pocketbook was taken and gone, and I called to my daughter and I said, 'Eileen, that thief got my pocketbook. He has taken my pocketbook.' " (Emphasis added.)

On cross-examination, Mrs. Newhook testified that she did not see the person who took her purse nor did she feel herself being pushed to the ground.

In this connection she testified:

"Q On October 31st, you weren't able to take a look at the person who had taken your purse, is that right? You couldn't recognize him, could you?

"A No. I never saw him.

"Q And if you looked at Mr. Chessman sitting in the courtroom here, can you tell us whether or not you saw him on October 31, 1977?

"A No, I never saw him. He came up from the back.

"Q Now, did you feel anything on your body, ma'am, that pushed you to the ground?

"MR. BRACKEN [Assistant District Attorney]: Objection, your Honor.

"THE COURT: Overruled.

"A No, no.

"Q You didn't feel anything that pushed you to the ground? You felt that your purse was being taken?

"A Yes.

"Q And the next thing you knew you were on the ground?

"A That's right."

On redirect examination, she again stated that she did not feel anything when her pocketbook was taken.

Her testimony at this point was as follows:

"Q You indicated, I believe, on cross-examination that you didn't feel anything. Is that correct?

"A *That's right.*

"Q There came a time that you fell, is that correct?

"A Right.

"Q Isn't that correct?

"A Yes.

"Q Now, when you started to fall, did you have a pocketbook in your hand at that time?

"A Yes, I did.

"Q Was it then taken from you after you started falling?

"A Yes. As I was falling, he took it and went." (Emphasis added.)

Her daughter, Mary Eileen, testified that she saw the perpetrator in a crouched position behind her mother and that he pushed her mother with his left hand causing her to fall and grabbed the pocketbook with his other hand and then fled.

Essentially, under the factual posture of the proof received at the trial, as above described, the jury was confronted with two different versions of how the crime was committed.

If the jury elected to believe that Mrs. Newhook's version of the event as described in her direct examination and that of her daughter were correct, the defendant's act of pushing Mrs. Newhook with his left hand with sufficient force to knock her down while stealing her purse with the other would constitute sufficient evidence to warrant a finding that force, within the meaning of section 160.00 of the Penal Law, was used to accomplish the theft and, accordingly, that he committed the crime of robbery (see *People v Santiago,* 62 AD2d 572, affd 48 NY2d 1023) which involved the *intentional and purposeful* use of the momentum of a moving train to accomplish a robbery by lifting a purse from a person standing on a subway platform. In the process, the victim was dragged, fell beneath the train and was killed. The Court of Appeals decided that this method of operation constituted attempted robbery.

However, if, on the other hand, the jury chose to believe the version of the event as described by Mrs. Newhook in her cross-examination, that she did not feel anything on her body "that pushed you to the ground" and that the purse was taken "as I was falling", such finding would not provide a sufficient evidentiary base to support a conviction for robbery for the reason that the necessary element of the use of "physical force upon another person" for the purpose of accomplishing the theft, required by section 160.00 of the Penal Law is lacking (see *People v Davis,* 71 AD2d 607). If Mrs. Newhook's testimony is to be taken as true, the jury may have concluded that her fall could have been due to a cause other than a push and that her purse was taken from her either before or as she was falling.

In any case, under this version of her testimony, there is no showing of either a reason for her fall or that she was pushed.

Thus, with the evidence in a state under which the defendant could be found guilty of either robbery in the third degree, or grand larceny in the third degree, or not guilty, the jury, following the court's charge, entered upon its deliberations at about 2:26 P.M.

After considering the matter for about an hour and a quarter, the jury returned to the courtroom and presented two notes requesting further instructions.

The content of the notes and the court's instructions were as follows:

"THE CLERK: Trial continued, Indictment No. 46681, the People versus Charles Chessman. The jurors are all present, sir. We have received two notes from the jury.

"THE COURT: Yes, we have. The first note reads as follows: 'Is the defendant's intent an issue, i.e., *whether or not he meant to cause Mrs. Newhook to fall to the ground or are we to judge robbery in the third degree solely on the basis that she did fall to the ground?'*

"The second is related and it reads as follows: *'Is the doctrine of force one that requires an attack on the person, or does a forcible pull on the body being held by the person constitute robbery?'*

"These are both answered by the same use of the part of the charge, and I will read them rather than have you dig them out.

"'A person is guilty of robbery in the third degree when he forcibly steals property.'

"What is forcible stealing? A person forcibly steals property and commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of preventing or overcoming resistance to the taking of the property or to the retention thereof after the taking.

"The gist of the crime of robbery is larceny by force, compulsion or fear of injury to the person from whom the property is taken.

"An element of the crime of larceny is that the wrongful taking or withholding of the property must be with intent to deprive another of property and to appropriate the same to the taker or to a third person. This means a specific intent.

"Therefore, members of the jury, specific intent applies to the crime of larceny and the same words are not found when physical force is involved which makes it a robbery. I believe that answers your question.

"You may retire." (Emphasis added.)

At about 8:00 P.M., a little more than four hours later, the

jury returned to the courtroom for further instructions and again presented two notes.

The notes and the ensuing instructions by the court were as follows:

"THE COURT: We have two notes from the jury. The first: 'We request a written copy of the portion of the charge which specifically describes robbery in the third degree and the definition of force.'

"The jurors have already been instructed that any portion of the Court's charge is impermissible in a criminal case.

"The second note: 'We request the reading of the portion of the charge which deals with robbery and the definition of force. Slowly, if possible.'

"Slowly it will be. As it pertains to this case, the Penal Law reads as follows: 'A person is guilty of robbery in the third degree when he forcibly steals property.'

"What is forcible stealing? A person forcibly steals property and commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of preventing or overcoming resistance to the taking of the property or to the retention thereof after the taking.

"Members of the jury, you may retire for further deliberations."

After this response, the jury retired and shortly thereafter returned a verdict of guilty of robbery in the third degree.

It would appear from the numerous questions submitted to the court and the request for additional instructions that the jury was having difficulty with the comprehension and application of the element of force as it relates to the crime of robbery.

This failure to understand the meaning of force is particularly underscored by the jurors' first question, "Is the defendant's intent an issue, i.e., whether or not he meant to cause Mrs. Newhook to fall to the ground, or are we to judge robbery in the third degree solely on the basis that she did fall to the ground?"

By the very nature of this question it is apparent that the jury was in doubt as to whether there must be proof of the defendant's intent to use force or whether Mrs. Newhook's mere falling to the ground was sufficient to make out the crime of robbery.

In the light of the fact that, under one version of Mrs. Newhook's testimony of the occurrence, she felt no push and that her purse was taken from her *after* she had begun to fall, clarification of the law pertaining to the element of intent to use physical force "for the purpose" of executing the robbery (Penal Law, § 160.00) became a prime necessity to enable the jury to deal with the fact-finding process and apply the correct law in this case which contained divergent testimony in relation to the use of force.

By its response the court merely repeated its former charge in relation to the crime of robbery in the third degree and reiterated the instruction of specific intent as the same applies to the crime of larceny. It provided the jury with no guidance in the form of an instruction concerning the culpable mental state requisite, within the meaning of that term under section 15.05 of the Penal Law, to use "physical force upon another person *for the purpose of*" committing the crime of robbery as defined in section 160.00 of the Penal Law. (Emphasis added.)

Webster's Seventh New Collegiate Dictionary defines "purpose" as "Something set up as an object or end to be attained: INTENTION."

It is obvious, therefore, that since robbery is not a strict liability crime, a culpable mental state is required for its commission (see Penal Law, §§ 15.10 and 15.15).

Notwithstanding that, under the rule expressed in *People v Tanner* (30 NY2d 102, 108), robbery "does not require a specific intent," that case does not obviate the necessity under the specific posture of the facts of this case for the trial court to explain that the force applied must be intended by the perpetrator to effectuate the underlying crime of larceny (Penal Law, § 160.00).

In *People v Tanner (supra)*, the robbery was a vicious act followed by a cold-blooded murder. In stating that specific intent was not required in defining robbery in the first degree, the court concluded that (p 108) "[a] robbery such as this could scarcely happen without a purpose to commit it." Although an instruction on "specific intent" may not be required in a case where the use of force is open and apparent, since the crime of robbery involves a culpable mental state (Penal Law, §§ 15.10 and 15.15), defined as "intentionally" under section 15.05 of the Penal Law, instructions to the jury concerning intent to use force to accomplish that offense are required.

The term "intentionally" is defined in the Penal Law as follows:

"§ 15.05 Culpability; definitions of culpable mental states.

"The following definitions are applicable to this chapter.

"1. 'Intentionally.' A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct."

Thus, for example, if one inadvertently applies force by coming into contact with an individual without "intentionally" doing so, the requisite of force is not satisfied because it was not exercised "for the purpose of * * * [p]reventing or overcoming resistance" (Penal Law, § 160.00). In such a situation, it was caused accidentally, although in the course of a larceny.

If a person intended to lift a purse or pick a pocket, silently and surreptitiously and with the utmost gentility but tripped accidentally in the process, knocking the victim to the ground, it could not be said that this constituted robbery or attempted robbery. The force would have to be exerted "intentionally", that is, *for the purpose of preventing or overcoming resistance* to the taking of the property or the retention thereof immediately after the taking or compelling the owner of such property or another person to deliver up the property.

Had the court, in response to the first question, instructed the jury that the force necessary to make out the crime of robbery must be applied *intentionally* for the *purpose* of carrying out the crime, the jury would not have labored under the mistaken impression that the crime may be established "solely on the basis that she did fall to the ground". The court's repeated instruction that "specific intent applies to the crime of larceny and the same words are not found when physical force is involved which makes it robbery" fortified the mistaken belief in the minds of the jurors that intent to use force had no application to the crime of robbery. The court's response to the second question from the jury concerning whether the doctrine of force is one that required an attack on the person, or does a forcible pull on the purse being held by the person constitute robbery, was similarly not answered by repeating the original charge.

The trial court's responses were wholly inadequate and at no time were the jurors afforded such proper instructions as would enable them to undertake their fact-finding tasks with

a full understanding of the law. Their continued confusion, by the court's failure to provide understandable and complete instructions, is best described in the following language contained in *Schwabach v Beth Israel Medical Center* (72 AD2d 308, 312): "Here, the jury, after the initial charge had been read to it, made clear its confusion and requested enlightenment on a specific matter. Their inability to relate the facts in issue to the law as charged to them is indicated by the questions propounded shortly after receiving the court's original charge. When, as in this case, the jury pinpoints their lack of understanding they are entitled to something more than that which led to their original confusion. They should have been instructed on the precise subject upon which they manifested their doubt *(Kramer v Chatham Green, Inc.,* 38 AD2d 931; *People v Botteri,* 50 AD2d 540; *Sanabria v City of New York,* 42 AD2d 615)."

Apart from the fact that the questions submitted by the jury had not been adequately answered, this error was further compounded by the court's total failure, in view of the divergent versions of the event, to marshal the evidence and to instruct on the law in relation to the facts as mandated by CPL 300.10 (subd 2) *(People v Mabry,* 58 AD2d 897; *People v Carney,* 73 AD2d 972). Accordingly, the judgment must be reversed, on the law, and a new trial ordered.

The defendant failed to raise in the trial court the question of the warrantless arrest in his home. We do not pass on any issues relative thereto. However, upon the new trial, defendant may, if he be so advised, renew his motion to suppress in the light of the recent decision of the United States Supreme Court in *Payton v New York* 445 US 573; see, also, *United States v Crews,* 445 US 463).

DAMIANI, J. P., LAZER, RABIN and MARGETT, JJ., concur.

Judgment of the County Court, Nassau County, rendered July 26, 1978, reversed, on the law, and new trial ordered.