■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MEHMET BICI, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Kings County (Lentol, J.), rendered April 3, 1981, convicting him of murder in the second degree and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence. Judgment reversed, on the law and as a matter of discretion in the interest of justice, and new trial ordered. The People called as a witness at the trial one Esat Bici, who at the date of the homicide was seven years of age. This witness was the child of the decedent and defendant. During the trial the court ordered an *in camera* "material witness hearing" with respect to this witness, at which hearing neither defendant nor his counsel was present. At the commencement of the hearing, the court indicated that the infant had given a statement to an Assistant District Attorney on September 18, 1979, "to the effect that he saw his father shoot his mother, heard his father tell his mother to stand still so he could shoot her, and when the police came, he saw his father jump out the window." The unsworn statement is more accurately summarized in defendant's brief as follows: "The statement, unsworn, was that Esat was at the time seven years old and had heard his father and mother screaming all day. He heard his father say 'stay still or I'll shoot you' and heard a shot go through a window. His mother then ran into a hall outside the apartment and tried to open a locked door and his father shot her. Esat's father then came back to the apartment and exited through one window as police officers came through another one. Esat had five times seen his father with guns which he had gotten from his grandfather. Before the police came, Esat's father telephoned the

grandfather and said he had four bullets. The father had red pills and was drowsy when he shot Esat's mother." The tenor of the proceedings at the *in camera* hearing reflects a design to test ex parte the admissibility of the statement made by the infant and further indicates an attempt on the part of the court to prepare the infant for his testimony in open court. At the completion of the *in camera* hearing the court concluded that the statement made by the infant was admissible. At that time the Law Guardian appointed by the court noted that the infant indicated that he told the truth on September 18, 1979, but that he denied making the assertions contained in. the September 18, 1979 statement. The court responded "That's the situation that will develop on the witness stand." Prior to swearing the infant the court conducted a *voir dire* and concluded that it was satisfied that the infant knew the difference between right and wrong, and knew the nature of an oath. Defense counsel requested copies of all statements made by the infant to the court and the Assistant District Attorney, at which time the court indicated that a copy of the stenographic minutes of the ex parte *in camera* hearing would be made available immediately upon receipt of same by the court. The court at that time advised counsel, "You'll be given an opportunity to cross-examine the witness with the benefit of the statement." Of necessity, it must be inferred that the statement being alluded to is the stenographic transcript of the material witness hearing, since the statement made by the infant on September 18, 1979 had previously been transcribed and was in fact available to the defense. At the completion of the direct testimony of the infant, the stenographic transcript was not yet available and defense counsel, without preserving any future right to cross-examination, indicated that he had no questions for the infant. Thereafter, and before the statement of September 18, 1979 was introduced into evidence, defense counsel once again requested an opportunity to see the stenographic minutes of the *in camera* hearing and requested a *voir dire* with respect to the September 18, 1979 statement. The court responded: "I told you that you could have them at any time before your cross-examination of the witness. You waived your cross-examination of the witness, but if you want the witness retained for cross-examination, I will permit you to recall that witness for cross-examination, and I will supply you with a copy of the minutes. I told you that before, and I repeat it to you again, you will not be denied the opportunity to examine him with respect to anything that's in those minutes. He'll be kept available for you." Defense counsel noted his exception for the record. Based upon the response made by the infant at trial, the court permitted the admission of the statement made on September 18, 1979 as a past recollection recorded (*People v Raja,* 77 AD2d 322, 325, admission of past recollection recorded "as substantive evidence of the truth of its contents"). This basic rule of evidence is succinctly stated in *People v Caprio* (25 AD2d 145, 150, affd 18 NY2d 617) as follows: "The rule of past recollection recorded may be simply stated. When a witness is unable to testify concerning facts recited by or through him in a memorandum, the memorandum is admissible as evidence of the facts contained therein if he observed the matter recorded, it was made contemporaneously with the occurrence of the facts recited and the witness is able to swear that he believed the memorandum correct at the time made." The testimony of the infant at the *in camera* hearing does not substantiate an essential element of the test of admissibility of a past recollection recorded, i.e., "that he believed the memorandum was correct at the time made", and, therefore, the trial court erred in permitting the statement's introduction into evidence. This was further compounded by the refusal of the court to allow defense counsel to conduct a *voir dire* with respect to such statement and by virtue of its charge to the jury

referring to such statement as follows: "Esat Bici testified that he doesn't remember the events of the evening of September 18th, 1979, but remembers talking to the district attorney, and that what he told the district attorney was the truth. People's Exhibit 7 was read to him, and he said that does not refresh his recollection. He said he didn't see his father kill his mother or go to the window. When he went to the judge's chambers, he said the same thing." The trial court's conduct and rulings with respect to the infant's statement were prejudicial and resulted in the following errors: (1) Deprivation of the effective assistance of counsel in that defense counsel was never given the right to participate in the *in camera* hearing, which was designed to test the admissibility of a statement made by an infant witness and which, in fact, was a means whereby such witness was prepared for trial; (2) Defense counsel was unable to *voir dire* effectively the infant at the time the said statement was being offered into evidence, since the transcript of the *in camera* hearing was not available at that time; and (3) Erroneous admission of the statement as a past recollection recorded since in fact the test for such admissibility was not fully met, i.e., the infant challenged the accuracy of the statement. (This is a critical issue, since the statement was extremely damaging to defendant.) We also determine that the trial court erred in permitting the identification testimony by the witness Nisenson and erred in its charge when it stated with respect to the defendant's switching of clothing that it constituted "some evidence of a consciousness of guilt". Immediately prior to trial, the court was advised that the People had consented to a *Wade* hearing (which, in fact, was a required *Simmons* hearing) with respect to the display of a photograph to two alleged eyewitnesses within 15 to 30 minutes after the homicide. The defendant was granted permission to sit in the spectators' section of the courtroom during the hearing. The court determined that the separate photographic identifications made by each of the two witnesses were not tainted in any manner. As to the witness Patino the court noted that he was unable to identify the defendant during the course of the *Simmons* hearing. As to the witness Nisenson the court found as follows: "Insofar as the second witness is concerned, the Court is satisfied that his identification of the defendant in the courtroom was not suggested by any improper procedure on the part of anyone, and that his identification resulted from his observations of the defendant at the time of the commission of the crime or thereabouts, at the time and at the scene of the crime; * * * MR. BARSE [Defendant's attorney]: I take exception, your Honor. THE COURT: The defendant has an exception." During the course of Nisenson's cross-examination at the hearing he testified that his view of the person with the gun on September 18, 1979 was for a matter of seconds. At the trial this witness identified the defendant as the person he observed on September 18, 1979. Based upon certain trial testimony by Nisenson, the court included the following in its charge to the jury: "There has been testimony in this case by Paul Nisenson, that the defendant and a spectator switched clothing before a proceeding in this case. The defendant says he doesn't remember if he did. If you believe that he did, you may consider it as some evidence of a consciousness of guilt." This reference was to an exchange of clothes which occurred between the defendant and a spectator (one Sabri Jakova) prior to the *Simmons* hearing. It should be noted that before the hearing was held, both the Assistant District Attorney and the identification witnesses were in close proximity to the defendant outside the courtroom. It is clear from the record that the defendant thereafter exchanged clothing with Jakova, who resembled the defendant, and then both the defendant and Jakova seated themselves in the spectator section of the courtroom. There exists no basis in fact to view the switching of clothing as any sign of consciousness of guilt on the part of the defendant. As a matter of fact, such

exchange may be attributable to the defendant's seeking to prevent a misidentification, particularly since the eyewitnesses were present with the Assistant District Attorney at the time defendant was outside the courtoom and immediately prior to the hearing. The facts in *People v Pilgrim* (67 AD2d 1011), wherein the defendant exchanged his name and clothing with another individual for purpose of a lineup, four days after defendant's arrest and a homicide, are distinguishable from the facts preceding the change of clothes by the defendant herein. In order to eliminate the possibility of contrived circumstances for identification, the switching of clothes at the *Simmons* hearing, which was held one year and five months after the homicide in question, cannot be considered as consciousness of guilt. This is further highlighted by the manner in which Nisenson eventually identified the defendant. The transcript of a portion of the direct examination of Nisenson at the hearing, by the prosecution, includes the following: "Q Would you take a look at that photograph, please, previously marked People's number 1? A Yes, this is the photograph, this is the one I was shown both times. Q And who did you identify? A I pointed to this person right here. (Indicating) THE COURT: Let the record show that the Witness is pointing to the second person seated in the photograph from the left, second from the left. Q Now, would you take a look around the courtroom, and tell me if you see the person whom you saw with the gun on September 18th, 1979? A Yes, I do. Q Would you please indicate A Sitting right there, right behind you. (Indicating) MR. BARSE: Please stand up. (An individual stands up) MR. BARSE: Let the record indicate who the witness is pointing to, which is already in the record. THE COURT: Let the record indicate that the witness has pointed to Sabri Jakova. Q Now, Mr. Nisenson, would you please leave the witness box, with the Court's permission, and walk up to that gentleman and the other gentleman who is seated in the courtroom. (The witness leaves the witness stand) Q Would you walk up to the two gentlemen that are seated in the courtroom, three gentlemen that are seated in the courtroom, and take a close look at each of them, please. MR. BARSE: Stand up. (Three individuals stand up.) A I made a mistake before. Could I correct myself, your Honor? THE COURT: What do you want to say? THE WITNESS: When I was sitting up there, I picked out the wrong gentlemen, I — Q Okay, do you now — which is the person that you saw with the gun on September 18th, 1979? A That gentleman standing right over there, standing right there. (Indicating) MR. ROTH [Prosecutor]: Indicating the defendant Bici." The identification of the defendant by Nisenson was biased and tainted by the manner in which he finally identified him. In addition, the limited opportunity of Nisenson to view the person with the gun at the time of the homicide, the length of time between the crime and the *Simmons* hearing, and the initial misidentification clearly do not support an independent source for the identification testimony by this witness (see *Manson v Brathwaite*, 432 US 98; cf. *People v Adams*, 53 NY2d 241; *People v Bruno*, 77 AD2d 922). There was no justification, therefore, for the admission of the in-court identification trial testimony and the trial court erred in permitting such testimony (cf. *United States v Crews*, 445 US 463; *People v Ballott*, 20 NY2d 600; *People v Bruno, supra*). Damiani, J. P., Mangano, Weinstein and Bracken, JJ., concur.