THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LAWRENCE K. HERRON, Defendant-Appellant.

Third District    No. 79-82

Opinion filed November 6, 1980.—Rehearing denied November 26, 1980.

Robert Agostinelli and Peter A. Carusona, both of State Appellate Defender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE STENGEL delivered the opinion of the court:

Lawrence Herron, defendant, was tried before a jury and found guilty of armed robbery. He was sentenced to a term of 12 years. Defendant appeals arguing (1) that the trial court erred in denying his motion to suppress certain evidence, (2) that the police officers improperly stopped the defendant pursuant to *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, (3) that the trial court erred in finding that defendant voluntarily consented to accompany the police officers to the scene of the offense, (4) that the trial court erred in denying defendant's pretrial motion to suppress, which urged the initial identification of defendant was improper because it was the fruit of an illegal arrest.

At the hearing on the motion to suppress evidence the following facts were presented. On August 30, 1978, Officers Walters and Look of the Peoria County Sheriff's Department were on patrol in a marked squad car when, at 12:30 a.m., they were advised by the police radio that there had just been an armed robbery at a nearby 7-11 store. No description of the suspect was given. Upon receiving the call, the officers, who were only about 1½ blocks from the store, immediately turned toward the store when Officer Walters noticed a black male, the defendant, walking toward them in a direction away from the scene of the armed robbery, carrying something in his hand which the officers could not discern.

Both officers, Gary Walters and Harold Look, stepped out of their marked police car and drew their weapons because they were suspicious of what was in the defendant's hand. As Officer Look approached defendant, while Officer Walters remained at the side of the squad car, Look testified, "I drew my revolver but I did not approach him with it drawn. I put it away as I was going up to him," after seeing defendant drop the object he was carrying. A limited pat-down of defendant for weapons was conducted. The search revealed no contraband or weapons. It was later discovered that the objects dropped by the defendant were the same hat and sunglasses worn by the robber.

Officer Look explained to the defendant that there had just been an armed robbery, and defendant indicated he had seen someone running in a northerly direction. Look asked defendant if he would go to the 7-11 store as a witness. Defendant agreed to go, walked with Look to the squad car and got in. Defendant was not placed under arrest nor was he handcuffed. We believe it important to note that defendant opened the rear door of the police car himself, got into the back seat alone and rode to the store sitting by himself in the back seat, while both officers occupied the front seat, contrary to the customary police practice of transporting suspects who are under arrest.

After they arrived at the store, Look went inside and spoke to the cashier, the victim of the armed robbery, and she related the description of the bandit as a black male, about 5'11", sunglasses, a hat, light-colored jacket and armed with a blue revolver with pearl handle. The victim further related that defendant took five $5 bills, some $1 bills, and a paper bag containing certain bottle caps. Look recognized that the description matched defendant and, returning to the car, he asked defendant to step out. Walters also got out of the car and stood next to the defendant. Look then asked the cashier if she could identify defendant, and she indicated defendant was the man who had just held her up. Defendant was placed under arrest and searched by Officer McCoy who recovered $71 in currency, which included five $5 bills. After Walters took defendant to the Peoria County jail, he returned to the street where he had first encountered defendant. There he found a paper sack containing the bottle caps which had been taken in the robbery and a revolver, both having been thrown under a parked truck.

The sack had defendant's fingerprints on it, but no fingerprints were found on the handgun. Defendant testified at trial that he had won $71 at a crap game and was walking down the street where he was to be picked up by a friend when he saw a paper bag near a truck. He picked it up, saw it was only bottle caps and threw it away.

Prior to trial, defendant moved to suppress the currency found on his

person, the pearl-handled revolver, the sack containing bottle caps, articles of defendant's clothing, fingerprints and the out-of-court identification.

On appeal, defendant contends that the trial court erred in denying his motion to suppress. Defendant contends that the initial stop was impermissible under the fourth and fourteenth amendments and that defendant's consent to accompany the police to the 7-11 store was not voluntary.

We first consider the permissibility of the initial stop. Defendant urges us to hold that the original stop was an arrest for which there was no probable cause. The People urge us to consider it a permissible stop which met the standards promulgated in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. There is a difference between an arrest and a stop for questioning. An arrest is the initial stage in a prospective criminal prosecution. It is the taking of a person into custody (Ill. Rev. Stat. 1977, ch. 38, par. 102—5), and is accomplished by an actual restraint of that person or by his submission to custody (Ill. Rev. Stat. 1977, ch. 38, par. 107—5(a)). On the other hand, a brief, investigative questioning is not an arrest. The Code of Criminal Procedure of our State provides that:

> "A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person * * * has committed an offense * * *, and may demand the name and address of the person and an explanation of his actions." (Ill. Rev. Stat. 1977, ch. 38, par. 107—14.)

The Code of Criminal Procedure also provides that during this temporary questioning a peace officer may search the person for weapons if he reasonably believes that he is in danger of attack. Ill. Rev. Stat. 1977, ch. 38, par. 108—1.01.

■■ Although defendant contends the officers did not consider Herron a suspect when he was initially stopped, we believe they had a right to make an investigatory stop because they were in possession of sufficient articulable facts reasonably to infer that criminal activity was afoot. When the defendant voluntarily suggested that he had seen someone running from the scene of the offense, the officers were entitled to make further inquiry. See *People v. Rogers* (1979), 71 Ill. App. 3d 1046, 390 N.E.2d 542.

In *People v. Thomas* (1973), 9 Ill. App. 3d 1080, 293 N.E.2d 698, a similar set of facts was presented. There the defendant contended that, when the police officers received a radio message of a woman screaming for help on the 10th floor of a building, and they arrived about a minute later and observed defendant, a male Negro shabbily dressed, run past

them from the vicinity of the stairway in the lobby, his arrest was unlawful, thereby tainting subsequent on-the-scene and in-court identification of him. The court held:

> "[T]he officers were faced with the 'appropriate circumstances' under which they reasonably could detain the defendant until the matter could be more fully investigated. Contrary to defendant's contention, he was not placed under arrest at that time, but only detained for questioning; probable cause did thereafter exist for his arrest when the officers received the description of the assailant which matched that of the defendant. The actions of the officers under these circumstances were reasonable and within the scope of the statute and the *Terry* case." 9 Ill. App. 3d 1080, 1081.

We believe the initial stop of defendant here was for investigative purposes pursuant to *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, and within the context of the instant case we do not believe the initial encounter, prior to the time the defendant was identified by the victim of the armed robbery, can be denominated an arrest.

In *United States v. Brignoni-Ponce* (1975), 422 U.S. 873, 880-81, 45 L. Ed. 2d 607, 616, 95 S. Ct. 2574, 2580, the court said:

> "We elaborated on *Terry* in *Adams v. Williams*, 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972), holding that a policeman was justified in approaching the respondent to investigate a tip that he was carrying narcotics and a gun.
>
> > 'The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response . . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.' *Id.*, at 145-146, 32 L. Ed. 2d 612, 92 S. Ct. 1921."

In the case before us the officers in answering the radio call of an armed robbery left their squad car with guns drawn because they were uncertain what defendant was carrying in his right hand near the scene of the armed robbery and within minutes of its commission. Certainly the officers had reason to fear for their safety. We do not believe it reasonable to assume under these circumstances that an inference can be drawn that they intended to restrain defendant. In *People v. Chestnut* (1980), 51 N.Y.2d 14, ___, 431 N.Y.S.2d 485, 489, 409 N.E.2d 958, 961-62, the court considered a closely resembling set of facts and said:

"Nor does the fact that the officer approached the two men with guns drawn mandate that a different conclusion be reached. The officers had reason to believe that Hernandez had just committed a robbery, armed with a revolver. Certainly, they were justified in taking precautionary measures to ensure their own safety and well-being, not knowing for certain whether Hernandez or the defendant has possession of the gun. To hold that policemen, thrust into emergency situations where the difference between life and death is often measured in seconds, must isolate those persons whom they have probable cause to arrest from all bystanders before they can draw their guns is patently absurd. We simply cannot accept the premise, urged by defendant, that once a gun is drawn all persons being addressed by the officer are necessarily under arrest. Given the particular facts and circumstances of this case, the presence of the drawn gun did not transform the stop and frisk of defendant into an arrest."

To attempt to counter this reasoning, defendant contends he was not a suspicious individual but was merely walking down a residential sidewalk after midnight. This ignores the fact that he was moving away from the nearby scene of an armed robbery; was alone on the street without moving automobiles or other pedestrians; and was carrying something in his right hand. It is the totality of the circumstances which must be considered. In *Terry*, the police officer observed "＊ ＊ ＊ a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation." (392 U.S. 1, 22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880-81.) Moreover, each case must be decided on its own facts, and a reviewing court must affirm the trial court's decision unless that decision was manifestly erroneous. *People v. Blakes* (1977), 55 Ill. App. 3d 654, 370 N.E.2d 872.

A *Terry* stop is appropriate when the facts and circumstances are such that any competent police officer would be expected to act quickly in order to maintain the status quo rather than to observe the situation further. *People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537, 540, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624, involved an officer who saw two men wearing dark clothing enter a street from between a building and a vacant lot and proceed to walk in a normal fashion. The stop was made without knowing of *any* burglary or robbery having been committed—unlike the instant case. The court found it proper for the police to stop the defendant since the defendant might have eluded the officers had the officers attempted merely to observe them further rather than stop them immediately. 69 Ill. 2d 73, 76, 370 N.E.2d 537, 540.

Furthermore, in judging whether the officer had cause to act, the

reviewing court must keep in mind that police officers often must act upon a quick appraisal of the information before them.

We would not fault the police officer for stopping defendant here because, even if the officers had received a detailed description of the robber, it would have been necessary, because of the darkness and urgency, to stop the pedestrian to determine whether he was a suspect. Thus, the fact that the officers had no physical description does not invalidate the investigatory stop of a pedestrian under the circumstances of this case. See *People v. Robinson* (1976), 62 Ill. 2d 273, 276-77, 342 N.E.2d 356, 358.

The case before us is almost identical to *People v. Sanford* (1976), 34 Ill. App. 3d 990, 341 N.E.2d 453, *appeal denied* (1976), 63 Ill. 2d 554. In *Sanford* two officers of the Rockford police department were on patrol duty when they received a radio message at about midnight of the armed robbery of a gas station, without any description of the bandits. As they were driving toward the gas station at a point approximately 17-18 blocks from the station, they observed a motor vehicle traveling at a higher than normal rate of speed in a direction away from the gas station. They proceeded to follow the vehicle and when it stopped, the officers then, *with shotguns*, approached the occupants of the car and advised them that they were investigating an armed robbery. After this stop, the officers were advised by police radio that one of the robbers was Mark Dover. When Dover identified himself, all three men in the car were arrested, and a search was conducted that revealed a coin changer, a gun, and money. Just as in the instant case, the defendants contended their stop and arrest were illegal and that the evidence should have been suppressed. But the court held the detention and arrest were proper, and the seizure of the items incident thereto was, likewise, proper.

An attempt to distinguish *McGowan* by contending that in the case at bar, defendant was simply walking in a residential neighborhood, ignores the basic facts. Here the stop occurred just minutes after the reported robbery and within 1½ blocks of the store that was robbed. It was after midnight, and there was no one else around. Defendant was carrying something at his side, and he was walking in a direction away from the 7-11 store and in a predominantly white neighborhood. It is clear to us that these facts provided the officers with the articulable facts necessary to justify an investigatory stop under the *Terry* doctrine embodied in our statute. If these are not articulable facts, what could be more significant? Just common sense alerted the officers to the fact that defendant was in an unlikely place at an unlikely time.

In evaluating the facts and deductions, we should be aware that trained police officers "may be able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained ob-

server." (*United States v. Mendenhall* (1980), ___ U.S. ___, ___, 64 L. Ed. 2d 497, 515, 100 S. Ct. 1870, 1882, (Powell, J., concurring in part and concurring in the judgment) (quoting *Brown v. Texas* (1979), 443 U.S. 47, 52 n.2, 61 L. Ed. 2d 357, 362 n.2, 99 S. Ct. 2637, 2641 n.2).) Accordingly "the officer is entitled to assess the facts in light of his experience." 100 S. Ct. 1870, 1882.

The defendant argues that *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, forbade the police from taking him to the scene of the crime. Because of the difference between the factual situations in *Dunaway*, and in the case at bar, we believe *Dunaway* is inapposite. *Dunaway*, particularly, has no application to the instant case except in its general reaffirmance of *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.

In *Dunaway*, police officers were ordered to "pick up" the defendant and "bring him in," despite the absence of probable cause to arrest him. (442 U.S. 200, 203, 60 L. Ed. 2d 824, 829, 99 S. Ct. 2248, 2251.) When he was found, the defendant was taken into custody and had he resisted, he would have been physically prevented from leaving. (442 U.S. 200, 203, 60 L. Ed. 2d 824, 830, 99 S. Ct. 2248, 2251.) Hence the defendant in *Dunaway* was detained without his consent and without probable cause to be arrested.

In *District of Columbia v. M.M.* (D.C. App. 1979), 407 A.2d 698, a police officer stopped the two defendants on the street and advised them of a robbery a short time earlier. The officer also told the defendant that he was going to take them back to the scene of the robbery to be viewed by a witness. Prior to placing the defendants in his car, the officer frisked them for weapons. Upon returning to the scene of the crime, the witness identified the defendants as the robbers.

The trial court suppressed evidence and a statement obtained as a result of the officer's stop of the defendants because, in the trial court's opinion, the officer's action in placing the defendants in his car and returning them to the crime scene for identification constituted an arrest for which there was no probable cause. The appellate court reversed the lower court's suppression order and remanded the cause for further proceedings.

The appellate court reasoned that the officer's stopping the defendants on the streets was no more than a temporary investigative stop under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, justified by articulable circumstances. The court then considered whether transporting the defendants to the crime scene was an unreasonable intrusion and concluded that it was not, considering the brief period of time consumed in the transport, the proximity of the place of the stop to the scene of the crime, and the purpose of transporting the defendants, *i.e.*,

identification by a known eyewitness to a confirmed robbery. In a footnote, the court rejected the defendants' contention that *Dunaway* was applicable to their case. The court stated:

"There [in *Dunaway*], the defendant was taken to the police station and placed in its interrogation room for questioning without probable cause. The court concluded that this governmental intrusion 'was in important respects indistinguishable from a traditional arrest' and hence went beyond what *Terry* permits. Here, the record reflects police action of detaining prime criminal suspects *on the street* until identification could be made." 407 A.2d 698, 701 n.3.

The inapplicability of *Dunaway* to the instant case is even more compelling than it was in *M.M.* While, in *M.M.*, the defendants apparently were taken to the crime scene against their will, in the case at bar defendant was asked if he would accompany the officers to the scene as a potential witness. We believe that defendant voluntarily accompanied the officers to the scene as a possible witness, but even had he been taken involuntarily, *M.M.* would support the position that *Dunaway* is inapplicable. As in *M.M.*, the time consumed in taking the defendant to the crime scene was short, the proximity of the place of the stop to the scene of the crime was close, and the purpose was not even for identification but to insure that the defendant would be immediately available as a witness to the offender's identity.

We next consider defendant's argument that his consent to accompany the officers to the 7-11 store was not voluntary. In the instant case, when the police first encountered defendant, he volunteered the statement that he had seen someone running from the area of the store. Defendant agreed to accompany the officers to the 7-11 store to assist in their investigation. Defendant admits in his reply brief "there is no direct testimony that the two officers had their guns out when defendant consented." Consent is a factual matter to be determined in the first instance by the trial court, and the trial court's determination will not be reversed unless clearly unreasonable. *People v. Denwiddie* (1977), 50 Ill. App. 3d 184, 365 N.E.2d 978.

Within the past few months the Supreme Court issued its opinion in *United States v. Mendenhall* (1980), ___ U.S. ___, 64 L. Ed. 2d 497, 100 S. Ct. 1870, where they considered factual circumstances closely analogous to those presented here. Two DEA agents on duty at the Detroit Airport observed Ms. Mendenhall, the last passenger to disembark from a plane that had just arrived from Los Angeles. Her behavior attracted the attention of the agents and they followed her. After a time, they approached her on the concourse and identified themselves as Federal agents. They

requested to see her ticket and some identification, which she produced, and asked her a few questions. Thereafter the agents accompanied Ms. Mendenhall to the airport DEA office, and a subsequent body search revealed that she was carrying heroin. ___ U.S. ___, ___, 64 L. Ed. 2d 497, 504-05, 100 S. Ct. 1870, 1873-74.

The Supreme Court reversed and remanded, holding that the Court of Appeals for the Sixth Circuit had erred in reversing Ms. Mendenhall's conviction.

The Supreme Court found that no "seizure" of the respondent occurred. After returning the airline ticket and driver's license to her, the agent asked if she would accompany him to the Airport DEA office for further questions, and she did so, although the record does not indicate a verbal response to the request. The court observed, "The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the question was a law enforcement official." (___ U.S. ___, ___, 64 L. Ed. 2d 497, 510, 100 S. Ct. 1870, 1877.) The court went on to say:

> "Moreover, characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws. 'Without such investigation, those who were innocent might be falsely accused, and those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. *Haynes v. Washington*, 373 U.S. 503, 515, [10 L. Ed. 2d 513, 83 S. Ct. 1336, 1344].' *Schneckloth v. Bustamonte, supra*, at 225, 36 L. Ed. 2d 854, 93 S. Ct. 2041." ___ U.S. ___, ___, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877.

In the instant case, when the police first encountered defendant, he volunteered the statement that he had seen someone running from the area of the store. Ironically, *Mendenhall*, ___ U.S. ___, ___, 64 L. Ed. 2d 497, 510, 100 S. Ct. 1870, 1878, states: "It may happen that a person makes statements to law enforcement officials that he later regrets, but the issue in such cases is not whether the statement was self-protective, but rather whether it was made voluntarily." Defendant agreed to accompany the officers to the 7-11 store to assist in their investigation as a potential witness. He opened the rear door of the police car himself, got into the

back seat alone and rode to the store sitting by himself in the back seat, while both officers occupied the front seat. We believe these facts support the trial court's finding that defendant went with the officers voluntarily.

*Mendenhall* construed a similar issue where it stated:

> "Our conclusion that no seizure occurred is not affected by the fact that the respondent was not expressly told by the agents that she was free to decline to cooperate with their inquiry, for the voluntariness of her responses does not depend upon her having been so informed. See *Schneckloth v. Bustamonte*, 412 U.S. 218. We also reject the argument that the only inference to be drawn from the fact that the respondent acted in a manner so contrary to her self-interest is that she was compelled to answer the agents' questions. It may happen that a person makes statements to law enforcement officials that he later regrets, but the issue in such cases is not whether the statement was self-protective, but rather whether it was made voluntarily." *Mendenhall*, ___ U.S. ___, ___, 64 L. Ed. 2d 497, 510, 100 S. Ct. 1870, 1878.

■■ Even if the defendant had been unconstitutionally seized, his contention that the on-the-scene identification and the in-court identification by the victim should be suppressed as fruits of the poisonous tree is without merit. (See *People v. Holdman* (1978), 73 Ill. 2d 213, 383 N.E.2d 155.) We also believe that the in-court identification should not be suppressed because of a strikingly similar issue in *United States v. Crews* (1980), 445 U.S. 463, 63 L. Ed. 2d 537, 100 S. Ct. 1244. There the Supreme Court held that the in-court identification of a robbery defendant by his victim was not a suppressible fruit of the defendant's earlier illegal arrest. In the case at bar, the on-the-scene identification was not the result of an illegal arrest nor did it taint the victim's ability to give an accurate in-court identification. The victim was able to describe the defendant to the police before the police showed him to her.

■■ It is clear that the evidence obtained after the defendant's arrest at the 7-11 store was incidental to that arrest and not the fruits of the poisonous tree. Furthermore, the sack of bottlecaps and revolver were found under a truck parked on a public street when, after the defendant was arrested, the officers returned to the area where the defendant was first discovered. This was abandoned property, and the defendant has no standing to attack these items. Its discovery was in no way a result of any alleged illegal detention.

For the above mentioned reasons, the judgment of the Circuit Court of Peoria County is affirmed.

Affirmed.

Mr. JUSTICE BARRY, specially concurring:

Although there was no description of the defendant, in accord with Justice Stengel I believe the stop here was not an arrest, but rather was a reasonable limited intrusion upon the defendant's liberty, considering that a crime had been committed nearby minutes before. There were, in my opinion, sufficient articulable objective facts necessary to justify a proper investigatory *Terry* stop, a stop authorized for the protection of the officers and others.

Further, I find no evidence of coercion to have caused the defendant to accompany the officers to the 7-11 Store. It is uncontroverted that the defendant indicated that he saw someone running from the direction of the scene, that he was then requested by the officers to go to the scene to assist in the investigation, and that he then consented to join the officers voluntarily.

However, although for these reasons I concur with the result reached by Justice Stengel, I cannot, and do not, subscribe to all of the reasoning used by Justice Stengel in affirming the trial court. I believe that *Mendenhall* and *McGowan*, while standing as authority for Justice Stengel's position, represent dangerous precedents which must be applied cautiously and with restraint to cases such as this. I consider them to be "dangerous" in the sense that repeated reliance upon them may result in an unwarranted expansion of their holdings and a concomitant continual erosion of the right of every citizen to be free from unjustified governmental intrusion. I believe that *Mendenhall* and *McGowan* represent the extreme with regard to the minimum facts necessary to justify an investigatory *Terry* type stop. The giving of a judicial imprimatur to every investigatory stop through a reliance on these cases will transform the objective articulable facts now required by police officers under *Terry* to a mere bare subjective suspicion.

As I have stated, I believe sufficient objective facts are present in this case to justify the police conduct, and therefore I concur. However, because of my misgivings about the reliance upon *Mendenhall* and *McGowan* by Justice Stengel under the facts of this case, this concurrence is qualified.

Mr. JUSTICE STOUDER, concurring in part and dissenting in part:

While I agree with the majority that the in-court identification of the defendant and the sack of bottlecaps and revolver found on the street should not be suppressed, I must dissent from the balance of the majority opinion.

My initial area of disagreement concerns whether or not the original seizure was a permissible stop which met the standards promulgated in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. In *Terry*,

the Supreme Court held that there may be a brief, on-the-spot stop on the street and a frisk for weapons without probable cause so long as the police officer making the stop is able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. (392 U.S. 1, 21, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1879-80.) In Illinois, the *Terry* exception to the probable cause requirement has been codified as permitting an officer to stop a person in any public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense. Such detention and temporary questioning are to be conducted in the vicinity of where the person was stopped. Ill. Rev. Stat. 1977, ch. 38, par. 107—14.

Contrary to the majority's contention, the facts in the present case do not satisfy the requirements in *Terry*. The facts show that the officers heard a police broadcast that there had been an armed robbery a few blocks from where they were patrolling. The broadcast did not contain any description of the suspect. They turned onto Ayres and saw a black male walking towards them on the sidewalk. He was wearing a tan jacket and carrying an unidentified object in his hand. He was about 1½ blocks from the 7-11 store. The defendant was engaged in no furtive behavior. He was merely walking on the sidewalk in a residential area where it was entirely reasonable for him to be. The defendant's clothes were by no means suspicious.

The majority argues that because there was a robbery a couple of blocks away, this somehow transforms a commonplace situation into one in which the totality of the circumstances was adequate to enable the officers to reasonably infer that the defendant had committed an offense. This argument is refuted by the testimony of one of the officers himself. Officer Look testified that when he first saw the defendant walking he did not consider him a suspect. While the standard to be used in evaluating the propriety of a *Terry* stop is an objective analysis of the situation confronting the officer, it is highly probative that the circumstances were such that one of the officers involved in the incident admitted that at the time of the stop he did not consider the defendant to be a suspect. (See *People v. Roberts* (1971), 2 Ill. App. 3d 927, 274 N.E.2d 688.) I believe, therefore, that the circumstances, considered in their entirety, did not present the officers a situation in which they could reasonably infer that the defendant had committed an offense.

Nor does the initial stop meet the *Terry* standard as elaborated on in later cases such as *United States v. Brignoni-Ponce* (1975), 422 U.S. 873, 45 L. Ed. 2d 607, 95 S. Ct. 2574. The passage cited by the majority belies the majority's argument that the initial detention met the standards for a *Terry* stop. The passage states that a brief stop of a *suspicious* individual

is permitted. The point that must be emphasized is that at the time of the detention the defendant was not a suspicious individual. He was merely walking down a residential sidewalk at a little after midnight. There is nothing suspicious about such behavior. Nor did the defendant engage in any behavior which might arouse suspicion. As stated above, even Officer Look did not consider him a suspect at the time of the detention. The fact that the defendant was black and walking in a predominantly white neighborhood is not adequate to make a *Terry* stop.

The case at bar is similar to *Reid v. Georgia* (1980), ___ U.S. ___, 65 L. Ed. 2d 890, 100 S. Ct. 2752. In *Reid*, an agent of the Federal Drug Enforcement Administration (DEA) was on duty in a Georgia airport and observed two men carrying similar shoulder bags disembark from a plane. The two men were separated by several other passengers. As they proceeded through the concourse Reid occasionally glanced back at the second man. When they reached the main lobby of the terminal, they joined each other and left the terminal together. The DEA agent approached them, identified himself as an agent and asked them to show him their airline ticket stubs and identification, which they did. The agent then àsked them if they would agree to return to the terminal and consent to a search of their persons and their shoulder bags. The agent testified that they agreed, but as they entered the terminal, Reid began to run and, before he was apprehended, abandoned his shoulder bag. The bag, when recovered, was found to contain cocaine. Reid moved to suppress the cocaine and the Supreme Court held that it should have been suppressed. The court held that although (1) the defendant had arrived from Fort Lauderdale, a principal place of origin for cocaine sold in this country, (2) he arrived in the morning, when law enforcement was diminished, (3) defendant and his companion appeared to be trying to conceal the fact they were together, and (4) they had no luggage other than shoulder bags, this was not adequate to justify a *Terry* stop. The court held that a large percentage of travelers could fit this description and that the agent's belief that defendant and his companion were trying to conceal the fact they were travelling together was an inarticulable hunch which could not justify a *Terry* stop.

The case at bar is similar in that the defendant was simply walking down a residential street, wearing normal attire, and engaging in no furtive or suspicious behavior. If the circumstances in *Reid* did not justify a *Terry* stop, then neither did the circumstances in the present case.

There is no doubt that the police had the right to go up to the defendant and talk to him. Police officers have the liberty possessed by every other citizen to address questions to other persons. However, ordinarily the person addressed has an equal right to ignore his interrogator and walk away. (*United States v. Mendenhall* (1980), ___ U.S.

___, 64 L. Ed. 2d 497, 100 S. Ct. 1870.) In the instant case, however, the police trained their weapons on the defendant as they exited the police car and approached him. The defendant certainly could not ignore his interrogators and walk away. Therefore, this was more than a casual interrogation, it was a detention which, as previously shown, did not satisfy the requirements in *Terry* or any of its progeny.

The majority's reliance on *People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537, *People v. Sanford* (1976), 34 Ill. App. 3d 990, 341 N.E.2d 453, and *People v. Thomas* (1973), 9 Ill. App. 3d 1080, 293 N.E.2d 698, is inapt. Although the courts approved the actions of police officers in stopping the defendants in those cases, thereby superficially supporting the majority's position, these cases are distinguishable on their facts. In *McGowan*, the police stopped the defendant when they found him walking late at night in an industrial area which normally would have been deserted. He was in fact in an odd place at an odd time. In the instant case, the defendant was simply walking in a residential neighborhood. This is not an unusual place for a person to be, nor was the time so late that one would not expect anyone to be out walking.

In *Sanford*, a gas station had been robbed and the arresting officers were driving towards the station when they saw a van speeding away from the station. This is significantly different from the instant case, where the defendant was merely strolling down a residential street.

In *Thomas*, the officers had received a radio message of a woman screaming for help on the 10th floor of a building. When they arrived at the lobby where everyone was well dressed, a male ran past them from the vicinity of the stairway, shabbily dressed and panting and sweating. That situation is a far cry from the one in the case at bar. In the instant situation, the defendant was dressed in normal attire and was simply walking in a residential neighborhood.

Clearly, if the original detention was improper, then continued detention to take the defendant back to the 7-11 store against his will was improper. The question then arises as to whether or not the defendant voluntarily consented to accompany the officers to the 7-11 store. I disagree with the majority's holding that the defendant voluntarily consented.

Whether the defendant's consent was voluntary is a fact which must be decided from the totality of the circumstances. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041; *People v. Cole* (1977), 53 Ill. App. 3d 711, 368 N.E.2d 1308.) Consent is a factual matter to be determined in the first instance by the trial court, and the trial court's determination will not be reversed unless clearly unreasonable. (*People v. Denwiddie* (1977), 50 Ill. App. 3d 184, 365 N.E.2d 978.) In the instant case, the totality of the circumstances clearly shows that the

defendant's consent was not voluntary. The defendant, who had been walking down the street, was stopped by two officers who jumped out of their squad car, drew their weapons, and trained them on him. One officer approached him and frisked him while the other officer kept his gun pointed at the defendant. Then, with a gun still trained on him, the defendant was requested to accompany the officers to the store. The defendant was not told that he had the right to refuse to accompany them. At the suppression hearing, the defendant testified that he accompanied the police "because the other officer still had his gun out."

In *People v. Householder* (1980), 81 Ill. App. 3d 31, 400 N.E.2d 988, an officer accompanied Mrs. Householder to Householder's apartment to obtain her possessions. Householder tried to close the door because of noises from outside, and the officer prevented him from closing the door and entered the apartment. It was disputed as to whether or not the defendant then invited the officer in. The court held that even if the defendant asked the officer to enter the apartment after he blocked the door, "this request is not equivalent to consent to enter the apartment. The blocking of the door is certainly more overt than the subtle coercion or implicit means of obtaining consent established by *Schneckloth* as the threshold of objectionable action." 81 Ill. App. 3d 31, 34.

If blocking a door was coercive in *Householder*, the situation in the instant case, where the defendant has just been frisked and there is a gun trained on him, is much more coercive. "The whole atmosphere of the purported consent was, at best, one of submission or resignation to police authority." *People v. Clark Memorial Home* (1969), 114 Ill. App. 2d 249, 254, 252 N.E.2d 546, 549.

The majority cites *United States v. Mendenhall* to support its contention that defendant voluntarily accompanied the officers to the 7-11 store. This reliance is misplaced. In *Mendenhall*, two Drug Enforcement Administration agents stopped the defendant at the Detroit Airport after she disembarked from a flight from Los Angeles, claiming that upon observing her she had displayed conduct characteristic of people smuggling narcotics. They approached her, identified themselves as Federal agents and, after questioning her briefly, asked her if she would accompany them to the airport DEA office for further questioning. She agreed to do so. At the office the agents asked her if she would allow them to search her person and handbag. They informed her she could decline the search and she responded "go ahead" and gave them her purse. A female police officer, called in to conduct the search, again asked her if she consented to the search, and she replied that she did. The search resulted in the agents finding heroin. Defendant's motion to suppress was denied by the trial court, and the court of appeals reversed. In reversing the court of appeals and affirming the trial court,

the Supreme Court held that the defendant had voluntarily consented to the search.

The facts in the instant case are in marked contrast to *Mendenhall*. As stated earlier, the defendant was coerced into returning to the 7-11 store in that there was a gun trained on him. In fact, the court in *Mendenhall* specifically mentions that "* * * a person has been 'seized' within the meaning of the Fourth amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be * * * the display of a weapon by an officer * * *." Therefore, under the totality of the circumstances of this case, the defendant's consent to accompany the police to the store was not voluntary. The defendant undoubtedly felt he had to accompany the officers regardless of the reason they asked him.

Assuming for the sake of argument that the circumstances did justify a *Terry* stop, if the defendant did not accompany the officers back to the 7-11 store voluntarily, then I believe the officers could not legally force the defendant to accompany them. For purposes of analysis, the occurrences in the instant case must be split into two separate time frames—the occurrence leading up to the *Terry* stop and what happened after the stop. As stated previously, an officer can make a *Terry* stop only if the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. After the stop is made and the suspect has been questioned and frisked for weapons, one of two things can happen. First, the officer can find that there is probable cause the suspect committed the crime, in which case the officer can arrest him. Second, the officer can find there is not probable cause, in which case the officer must release the defendant. In the instant case, there is nothing in the record which would justify the officers finding probable cause that the defendant committed the crime. The circumstances leading to the stop were innocuous, and certainly none of the answers which the defendant gave were adequate for the officers to find probable cause. Upon frisking the defendant, the officers found no weapons. Therefore, the officers were obligated to release the defendant and could not force him to return to the store with them.

The majority would add a third possibility to the above-mentioned dichotomy. The majority opinion adds the possibility that although an officer doesn't find probable cause subsequent to the *Terry* stop, he can continue to detain the defendant and in fact can force him to accompany the officers back to the scene of the crime. There is no precedent for such a holding in Illinois. Neither can a justification be found from *Terry*. In *Terry*, the court held that a limited intrusion on a person's liberty is

permissible under certain circumstances. To force a person to accompany police officers back to the scene of the crime is a much more severe curtailment of the person's liberty, indistinguishable for all practical purposes from an arrest. No support for such a severe curtailment of a person's liberty in the absence of probable cause can be found in *Terry*.

Neither can support be found in Illinois law. In fact the statute codifying the standards required for a *Terry* stop prohibits the act of forcing someone to return to the scene of the crime under the aegis of a *Terry* stop. The statute reads "* * * Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped." (Ill. Rev. Stat. 1977, ch. 38, par. 107—14.) There is no way that transporting someone to the scene of the crime a couple of blocks away can be considered questioning in the vicinity of where he was stopped.

For this reason the majority's reliance on a District of Columbia case, *District of Columbia v. M.M.* (D.C. App. 1979), 407 A.2d 698, is misplaced. Even apart from the limiting language of the statutory provision in Illinois, I believe the court misanalyzed the fact situation in that case. In *M.M.*, the police officers had a description of the robbers from an eyewitness. This description was broadcast to an officer who picked up the defendants because they matched the description. The officer told them they matched the description of two men who had committed a robbery and advised them he would transport them back to the scene of the crime. Just before transporting them, he frisked them. The D.C. court held that although there was no probable cause, it was a legitimate *Terry* stop and that the circumstances warranted this intrusion on their liberty. While I agree that it was proper for the officer to transport the defendants back to the scene of the crime, I find it proper for a different reason than the D.C. court. I believe that when the officer stopped the defendants because they matched an eyewitness description, probable cause existed and so it would have been permissible to arrest them. I disagree with the court's characterization of this act as no more than a natural part of an investigative stop under *Terry* and find no rationale for it.

In any event, the Illinois statute precludes the adoption of this case in Illinois. Rather, probable cause is a requirement in any situation in which a defendant's liberty is curtailed to the extent necessary in transporting a suspect back to the scene of a crime against his will. Because there was no probable cause in the case at bar, it was improper to take the defendant back to the 7-11 store against his will.

Because the defendant was improperly stopped and he did not voluntarily accompany the officers back to the 7-11 store, it is clear that defendant's clothes, the currency found on defendant, the out-of-court identification, and his fingerprints taken after his arrest are fruits of the poisonous tree and must be suppressed.

The sack of bottlecaps and revolver were found when, after the defendant was arrested, Officer Look returned to the place where he first stopped the defendant. Under a truck, he found the sack and gun. I agree with the majority these items should not be suppressed. Good police methodology would have resulted in the area around the robbery being searched for clues. Since the area where these articles were found was within one block of the store, the police would have searched it as a matter of course. Therefore, they are not the result of the wrongful detention and should not be suppressed. I also agree with the majority that under *United States v. Crews* (1980), 445 U.S. 463, 63 L. Ed. 2d 537, 100 S. Ct. 1244, the in-court identification is not suppressible.