411 So.2d 1377 (1982)
Robert Lee BAILEY, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 80-1402.
District Court of Appeal of Florida, Fourth District.
April 7, 1982.
Rehearing Denied April 21, 1982.
Richard L. Jorandby, Public Defender, and Jon May, Asst. Public Defender, West Palm Beach, for appellant/cross-appellee.
Jim Smith, Atty. Gen., Tallahassee, and Robert L. Bogen and Trela J. White, Asst. Attys. Gen., West Palm Beach, for appellee/cross-appellant.
GLICKSTEIN, Judge.
Appellant seeks reversal of his conviction and sentence for manslaughter, basing error upon the trial court's refusal to allow impeachment of a state witness.[1] *1378 Finding the trial judge did not abuse his discretion by limiting the scope of cross-examination, we affirm the lower court's decision.
Appellant shot and killed his six-year-old daughter Pamela. The question presented at trial was whether he accidentally shot her or whether he intended to kill his wife but shot his daughter inadvertently.
Three eyewitnesses to the crime, among others, testified on behalf of the state. The first was appellant's thirteen-year-old daughter, the second was his wife, and the third was their older son. All three testified that on the night of the fatal shooting appellant threatened to kill his wife. Testimony was also given that appellant held the gun with both hands before the shot was fired.
At trial counsel attempted to set up the defense that appellant's wife was testifying falsely because she was having an affair with another man and wanted her husband out of the way. Outside the jury's presence, the court prohibited defense counsel from attempting to discredit the wife, ruling that her alleged extramarital relationship was irrelevant. Subsequent to this proffer, Elizabeth Stewart, appellant's sister, testified that after the shooting another man moved in with appellant's wife. Upon motion by the state, the court ordered this testimony stricken from the record. Appellant was found guilty of manslaughter and sentenced to nine years in prison.
Appellant argues the trial court's refusal to allow cross-examination of his wife concerning her infidelity violated his sixth amendment right[2] to confront his accusers. We agree the exposure of a witness's motivation in testifying is a constitutionally protected right. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). But that right has always been subject to a trial court's discretion in limiting and controlling cross-examination. Demps v. State, 395 So.2d 501 (Fla. 1981). Based upon our examination of the record, we conclude no abuse of discretion occurred.
Appellant testified in his own defense that on January 4, 1980, he and his wife had been drinking at Jack's Place in Belle Glade. He left there to go to the Blue Bell, another drinking spot, and his wife walked home. He then explained:
I was walking down the street, so I had seen her, she wasn't even much home, I had seen her, I was looking right at her. She was walking, there was a guy walking with her. He was a little taller than me.
So I caught her with  after she left the house where I live at, we walked to the yard together. That is when I started asking, I said "Ann, who that guy walking with you?" She said "Nobody."
So we get up on the porch, I was opening the door, I said "All right, now," like that there. So I opened the door and she said something, I probably sweared at her, or something. I probably did.
Ann went on in the house, she was bending down taking  I don't know, she was taking something out of the socks or putting something in it, I don't know. She was fooling around with her socks down there. So I throwed the keys on the coffee table, I said "Let me take this gun out the car." I took the gun out the car, locked the door, come back in. I was  there was a song I was humming. So after I had the gun, I started turning it like that. But the gun was already cocked, I didn't even look at the gun or check it, or anything. I started playing with the gun. And all of the kids and all was in the room. And I walked up there, and in my dining room, that is where the girl's bedroom was, I walked up in the door, I was still fooling around with the gun. And my son said "Daddy"  the one, Robert, he sat up and looked at me, *1379 he was smiling because he liked to see me do all kinds of stuff like that, you know. And the gun went off. He jumped up, he hollered "Daddy."
The testimony of the wife and two of appellant's other children painted an entirely different picture of the tragic shooting. The thirteen-year-old daughter testified that when her parents came home, her father told her mother he was going to shoot her brains out. After making this threat, appellant went to his bedroom, got his gun from the dresser, walked to the door of the other bedroom where the four children and their mother were gathered, held the gun with two hands and fired, striking the witness's younger sister.
Appellant's wife testified that after leaving Jack's Place, the couple went to a restaurant where they separated because she had to work the next morning. She walked home and sat on the porch, eating the food she had bought. When appellant arrived, he accused her of lying by telling him she had walked home alone. He then threatened to blow her brains out. She went to the children's bedroom to check on them and was hugging the youngest child on the bed when appellant appeared, holding a gun, and fired the fatal shot. Appellant's son, then a fourth-grade student, corroborated the testimony his mother and sister had given.
Were that all of the record, we might be inclined to give more credence to appellant's argument. After all, the shooting occurred in January and the trial in June, giving the alleged errant wife several months to weave a false story for herself and the children.
But the trial judge had other proof before him. One of the detectives investigating the incident testified, without objection, that two and one-half hours after the shooting appellant's wife, distraught over the plight of her husband and the death of her child, had told him the following:
We left Jack's Place, I told him I had to get up for work. When he got home, he rung the door bell. When my husband came to the porch, I was eating. My husband asked who that man was I was walking with. When I went to the bedroom, he got the gun and told me he was going to blow my brains out. I went to the other bedroom to check on the children. He came in where I was at and I was holding my baby where she was at, and I was hugging my baby from behind, and he fired. He took the baby from my bedroom to the kids' bedroom, and I heard another shot. He told the kids `I am sorry, I didn't mean it.' I took the gun from him and he left.
Perhaps even more telling was the detective's description, also admitted without objection, of appellant's children after the shooting:
Q Instead of describing it, tell the ladies and gentlemen of the jury what the children  did they in fact now actually show you physically how they saw their father holding the gun?
A They did, yes.
Q I would like you to stand up right there and tell these ladies and gentlemen and just show them what these children showed you.
A Basically this is a  if you get into it, this is a combat stance, something here, or bringing it down into here.
Now, the children, similar to this, when I asked them whether he was holding the weapon was like this, like this or in his hands, or how was it like this, they showed me something like this. To me it amazed me a little bit because it is something that you don't  for children this age, they are not going to say he had it like this. This is the basic position you hold the weapon in a stance, and they said the arms were outstretched, pointing like this. They were very emphatic about it.
Based on this evidence, the trial judge did not abuse his discretion in refusing to permit the defense to obtain denials from the wife of any affair with another man and in later striking the testimony of appellant's sister that the man had moved in with the *1380 wife after appellant was jailed.[3] It was, therefore, reasonable for the trial judge to consider as too tenuous the notion that appellant's wife within two and one-half hours after her youngest child was shot in her arms, concocted and so convincingly narrated such a twisted tale to the detective while at the same time or shortly thereafter mesmerizing her two children into corroborating the portrayal in order to get her husband out of the way. Accordingly, the judgment and sentence are affirmed.
AFFIRMED.
DELL, J., concurs.
HURLEY, J., concurs specially with opinion.
HURLEY, Judge, concurring specially.
In my view, the trial court erred and abused its discretion by unduly restricting the cross-examination of Mrs. Bailey. Its ruling contravened the following bedrock principles set forth in Kufrin v. State, 378 So.2d 1341 (Fla.3d DCA 1980):
The exposure of a witness' motivation in testifying is a proper function of the constitutionally protected right of cross examination. Bias or prejudice of a witness has an important bearing on his credibility and evidence tending to show such bias is relevant. Any evidence which tends to establish that a witness is appearing for the state for any reason other than merely to tell the truth should not be kept from the jury. Id. at 1342, (Citations omitted).
Nonetheless, due to the overwhelming cumulative proof of guilt, I am satisfied that the error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Knight v. State, 394 So.2d 997 (Fla. 1981). Consequently, I concur in the decision to affirm.
NOTES
[1] Appellant also argues the trial court erred in denying his requested jury instructions on excusable homicide and on the definition of a dangerous weapon. This point is totally without merit. The trial court followed the standard jury instructions in both instances and appellant's suggested instructions added nothing to them.
[2] The sixth amendment to the United States Constitution provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."
[3] The witness, although testifying as indicated, contradicted herself at trial by also saying the wife had been staying with the witness's aunt since the shooting.