494 So.2d 240 (1986)
Curtis Lee THOMAS, Appellant,
v.
STATE of Florida, Appellee.
No. 85-2707.
District Court of Appeal of Florida, Fourth District.
September 3, 1986.
Certification Denied October 8, 1986.
*241 Douglas N. Duncan and Robert P. Foley of Foley, Colton & Butler, West Palm Beach, for appellant.
Jim Smith, Atty. Gen., Tallahassee and Georgina Jimenez-Orosa, Asst. Atty. Gen., West Palm Beach, for appellee.
GLICKSTEIN, Judge.
Defendant appeals his conviction and sentence. We affirm.
On May 7, 1983, at approximately 7:30 p.m., Maurine Collins, a sixty-three year old woman, was working in the front office of her travel agency located on Datura Street in West Palm Beach, Florida. Ms. Collins had living quarters above the business. She was grabbed from behind by an intruder wearing a stocking cap. However, Ms. Collins was able to observe that the intruder was a black male, had a short beard and a moustache, was approximately five feet eight inches tall and weighed approximately one hundred forty-five to one hundred fifty-five pounds. The intruder walked Ms. Collins through the offices and at one point he stopped her and she turned around, seeing his face clearly as if they were standing "face to face." At that point appellant reached to pull his stocking cap down and told Ms. Collins "[i]f you look at me I will kill you." Ms. Collins stated that he had the stocking cap off and on, during the burglary, sexual battery, and robbery of the victim's collection of pre-1965 silver dimes.
*242 Subsequent to appellant's arrest, the trial court judge conducted a hearing upon appellant's motion to suppress; and his subsequent order recites:
On May 8, 1983, Sgt. James R. Miller of the West Palm Beach Police Department, pursuant to information given to him by a fellow officer, went to J.B.'s Market located at 814 Georgia Avenue in West Palm Beach. He spoke with the manager who showed him five rolls of silver dimes he had purchased from a black male earlier that day for $50. On the following day, May 9, 1983, Miller returned to the market and recovered the five rolls of dimes. Later that afternoon, Miller showed the five rolls of dimes to the victim. However, she was only able to identify two dimes from among the five rolls, based on corrosion marks thereon.
Based on additional information from another fellow officer, Miller went to Mae's Place, 601 Clematis Street, West Palm Beach on the afternoon of May 9, 1983. At that location, Miller recovered three rolls of silver dimes the owner had purchased earlier in the day from a black male "in his twenties, wearing dark clothing." Miller left his card with the owner, instructing her to call him should the black male return to her place of business. Thereupon, Miller returned to his headquarters where he filled out a "hot sheet" on the foregoing information, preparatory to going off duty. He also spoke with Sgt. Alex B. Barrett who was coming on duty, filling him in on the above facts. It should be noted at this point that the three rolls of dimes recovered at Mae's Place had not been shown to the victim for identification purposes.
About 4:30 P.M. that same day, May 9, 1983, Sgt. Rob Robertson received a telephone call at the police department from Mae's Place to the effect that the black male from whom the three rolls of dimes had been purchased was then on the premises at Mae's Place. She gave Robertson a detailed description of the black male. Shortly thereafter, Barrett and Robertson, in civilian clothes and riding in an unmarked automobile, arrived at Mae's Place and observed the defendant, Curtis Lee Thomas, standing in front of the premises wearing clothing fitting the description given. The defendant began to walk south across Clematis Street where he was stopped by the officers. Upon inquiry from Barrett, the defendant stated that his name was "Walter Broom." Barrett told the defendant "we are investigating a case and need you to accompany us to the police station," without advising the defendant of his right to refuse. The defendant was "patted down" by Robertson and thereupon transported to the police station. He was placed in an interview room by Robertson and ordered to empty his pockets. In addition thereto, Robertson physically searched the defendant's person and found nine pre-1965 silver dimes, among other coins and small currency, a bag of marijuana and a marijuana cigarette in his trouser pockets. Robertson then picked up a nylon pouch the defendant was carrying and said, "You really don't want me to look in here, do you?" Upon opening the pouch, Robertson found "numerous nickels and bags of marijuana." It was during this occasion in the interview room that the defendant gave his true name as "Curtis Lee Thomas," a fact already known to Robertson, according to his testimony. Thereafter, the defendant was photographed and fingerprinted in the booking process. It should be noted at this point that the defendant already had a file jacket on record at the West Palm Beach Police Department under the name of "Curtis Lee Thomas" containing his background data, photograph and fingerprint standards, which fact was known to Barrett and Robertson.
Sgt. James E. Wilburn, Jr. of the West Palm Beach Police Department testified that he compared the standard fingerprints that he obtained from the defendant during the May 9, 1983 booking process with the latent fingerprints he had lifted from the point of entry of the *243 crime scene involved herein. However, it should also be noted that Barrett contradicted Wilburn by testifying that Wilburn had used the standards already contained in the defendant's file jacket rather than the standards obtained during the booking process in making the comparison. In any event, the comparison revealed that the standard and latent prints were made by the same person, namely the defendant.
Finally, in conclusion of the salient facts, the defendant was placed in a live lineup on May 24, 1983 at which time he was viewed by the victim of the crimes charged herein, as well as seven other victims in unrelated cases. The defendant apparently was still in custody at that time, unable to make bond. (Emphasis added.)
The appellate record contains nothing in writing from the trial court to confirm what occurred on May 10, 1983; but the parties do not dispute that on said date, a county judge held a preliminary hearing required by Florida Rules of Criminal Procedure 3.130, 3.131 and 3.133, the procedures for which are described in The Florida Judge's Manual, Vol. II, Chapter 1, Initial Proceedings (1985). The judge found probable cause, based on the probable cause affidavit in the record, dated May 9, 1983, which described the offenses for which appellant was arrested but which also said with respect to his arrest:
I requested that he accompany me to HQ. He readily agreed.
The county judge appointed a public defender to represent appellant. On May 17, 1983, the state moved to compel a live lineup of appellant, which a circuit judge granted, leading to the lineup of May 24, 1983, described above. At that time appellant was represented by the public defender. On May 26, 1983, appellant was charged by information with sexual battery, using physical force not likely to cause serious personal injury (Count I); burglary during which an assault was committed (Count II); and robbery without a weapon (Count III).
Appellant entered a plea of not guilty to all the charges. Prior to trial, the state filed a pretrial motion pursuant to Florida Rule of Criminal Procedure 3.220(b), to obtain hair, blood, and fingernail scrapings from appellant. On June 16, 1983, the trial court granted appellee's motion.
Appellant then filed a pretrial written motion to suppress evidence, including any testimony regarding fingerprint standards taken from appellant at the time of his arrest on May 9, 1983, and any comparisons based upon those standards. The motion also sought to suppress the identification made by the victim at the live lineup conducted on May 24, 1983. Appellant filed a subsequent motion to suppress any testimony concerning hair and blood comparisons, and sought suppression of all items on the ground that he had been illegally arrested on May 9, 1983, the above items of evidence being the "fruits" of that illegal arrest.
At an evidentiary hearing on appellant's motion to suppress, the trial court ruled that appellant had been illegally arrested, and granted appellant's motion in part, suppressing all items of evidence seized directly at the time of appellant's unlawful arrest. However, the trial court denied appellant's request to suppress evidence of the lineup identification and the fingerprint standards of appellant other than those taken at the time of his illegal arrest.
The state subsequently filed a motion to obtain fingerprint standards from appellant, pursuant to Florida Rule of Criminal Procedure 3.220(b)(1)(iii), which the trial court granted. The first jury trial resulted in a hung jury, and declaration of a mistrial. During the course of the second jury trial, appellant renewed his pretrial motion to suppress. At trial, the victim testified, over defense objection, that she had identified appellant in the lineup on May 24, 1983. Ms. Collins admitted that she had initially identified another man as her attacker, immediately after the incident, and also acknowledged that in route to the police station she identified a second man as being her attacker.
*244 Special agent Michael Malone, of the Federal Bureau of Investigation, testified that he had received a bed sheet belonging to the victim and a hair sample from appellant. He testified that he believed a head hair found on the sheet belonged to appellant.
The crime scene investigator, Sergeant William Wilbur, testified that he went to Ms. Collins' travel bureau on the night of the incident and discovered the rear door of her building was missing three jalousies. He determined this to be the point of entry. He eventually found the jalousies, and found that each of them had latent fingerprints on them. Wilbur also found identifiable fingerprints on the metal box described by Ms. Collins as the box which had contained her coins and which the intruder had picked up. Sergeant Wilbur then testified that he compared these latent fingerprints with appellant's standard fingerprints and that they matched. Lieutenant Gregory Parkinson also testified that the fingerprints matched.
Appellant presented the testimony of Kathy Brady, an assistant public defender, who testified that she was present at the lineup and that the victim appeared nervous and hesitant. Ms. Brady stated that the victim's selection of appellant as her attacker appeared to be not so much that appellant was in fact her attacker, but rather that of those men in the lineup, appellant most resembled the attacker.
At the close of all evidence, the trial court held a jury charge conference. Appellant filed a written requested special jury instruction, which was denied by the court. The jury returned guilty verdicts on all counts as charged. Appellant subsequently filed a motion for a new trial, which was denied, whereupon he was sentenced to fifteen years of imprisonment for Count I; life imprisonment for Count II; and fifteen years imprisonment for Count III. The trial court ordered all sentences to run concurrently with each other, but consecutively to the last sentence imposed by the trial court against appellant in another case.

I
The first issue is whether the trial court erred in denying appellant's motion to suppress identification evidence. We conclude that it did not.
Appellant first argues that the lineup was the fruit of the illegal arrest and therefore impermissible, and that the results of it should have been suppressed. Appellee points out that the judge who permitted the lineup concluded that the appellant's appearance at the preliminary hearing, together with the hearing on the motion to compel appellant to appear in a lineup were sufficient intervening circumstances to dissipate the taint of the illegal arrest. In support of this contention it cites to Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972). In Johnson the defendant claimed that he was unlawfully arrested and that his subsequent lineup identification was the fruit of the illegal arrest. The Supreme Court found no merit in this argument, stating:
The validity of Johnson's arrest, however, is beside the point here, for it is clear that no evidence that might properly be characterized as the fruit of an illegal entry and arrest was used against him at his trial. Prior to the lineup, at which Johnson was represented by counsel, he was brought before a committing magistrate to advise him of his rights and set bail. At the time of the lineup, the detention of the appellant was under the authority of this commitment. Consequently, the lineup was conducted not by "exploitation" of the challenged arrest but "by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).
Id., at 365, 92 S.Ct. at 1626, 81 L.Ed.2d at 161.
The exact facts of Johnson with regard to what happened before the magistrate are not made very clear in the Supreme Court's opinion, nor are they in Louisiana's supreme court decision State v. Johnson, *245 230 So.2d 825 (La. 1970), as the court in that case ultimately found there was probable cause for the warrantless arrest. However, appellant does not contend that the preliminary hearing in this case on May 10, 1983, was anything other than that previously described in this opinion.
We hold, initially, that, absent some additional factor, the trial court here correctly concluded that the preliminary hearing before the disinterested county court judge on May 10, 1983, and the subsequent hearing conducted by the circuit court judge on May 17, 1983, upon the state's motion to compel the lineup, purged the lineup of the original taint caused by the illegal arrest.
Appellant contends that there was an addition factor  the fact that the lineup was supportedly conducted in violation of one of the rules of discovery, Florida Rule of Criminal Procedure 3.220(b)(1)(i), which provides:
(b) Disclosure to Prosecution.
(1) After the filing of the indictment or information and subject to constitutional limitations, a judicial officer may require the accused to:
(i) Appear in a line-up;
In the present case the lineup was conducted before any indictment or information was filed. Appellant objected to the lineup on this ground, but the circuit judge found that the lineup would actually be to his advantage. While there does not appear to be any case law on whether a violation of rule 3.220(b)(1) by conducting a lineup or other evidentiary probe prior to the filing of formal charges will result in the suppression of that evidence, at oral argument Judge Wetherington suggested to counsel for the parties that the above rules appear to have been adopted to govern the proceedings once the court was involved by the filing of an information, just as the rules of civil procedure commence with the filing of the complaint. That suggestion, to us, is the answer to appellant's contention, and we hold that the above rule was not intended to prohibit a pre-indictment or pre-information lineup if good cause is shown to a disinterested judge, as was done here, for the conduct of one. The motion fully informed the judge of the non-filing and of the existence of several unsolved similar cases. As we know from Thomas v. State, 494 So.2d 248, also issued today, the lineup of May 24, 1983, cleared up at least one other episode of sexual battery involving appellant. The defense has provided no authority for the proposition that the conduct of an involuntary pre-indictment or pre-information lineup, ordered by a disinterested trial judge, is constitutionally invalid, nor any history to establish that the subject rule was approved by the appropriate committee of The Florida Bar, the Bar's Board of Governors and the Supreme Court of Florida with the intent to preclude lineups such as this. Appellant has never complained that the procedures employed at the lineup were in any way unfair. Further, Rule 3.220(b) is not worded in absolute terms (i.e., an information or indictment must be filed prior to any lineup). Rather it says that a lineup may be ordered after the filing of formal charges.
We take note of the state's fallback position that the evidence in question is properly admitted under the "inevitable discovery exception" to the exclusionary rule, enunciated in Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387-390 (1984), where the Supreme Court stated:
If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means... then the deterrence rationale has so little basis that the evidence should be received (Footnote omitted).
The court noted that the "purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct." The trial judge who relied on the state's motion to compel lineup found, with little discussion, that the inevitable discovery exception was not applicable to the present case; and we *246 choose not to rely upon the doctrine for our conclusions here.
Appellant also argues that the in-court identification should be excluded because the state has not shown that the incourt identification was independent of the lineup identification. In United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), the Supreme Court held that an in-court identification is not to be disallowed merely because a previous identification is found to be the result of an illegal arrest, if it is proven that the in-court identification is independent of the previous identification. In Howard v. State, 458 So.2d 407 (Fla. 4th DCA 1984), this court found that such proof must be by clear and convincing evidence. Because this court agrees with the trial court that the live lineup was permissible, this is really not an issue.

II
The second issue is whether the trial court erred in permitting the state to take appellant's fingerprints pursuant to Florida Rule of Criminal Procedure 3.220(b)(1)(iii). We conclude that it did not.
Because the original arrest was found to be illegal, the fingerprints taken at appellant's initial booking on May 9, 1983, were suppressed. The state's motion to take appellant's fingerprints was not filed until February 24, 1984, in preparation for trial. In State v. Tillman, 402 So.2d 19, 20 (Fla. 3d DCA 1981), the court stated:
An illegal arrest, withoutmore, has never been viewed as a bar to subsequent prosecution nor as a defense to a valid charge. United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). The defendant himself is not considered as suppressible fruit and the illegality of his initial stop and detention by the Public Safety Department officers and detectives does not deprive the State of an opportunity to prove his guilt through evidence which is not tainted by police misconduct. See: United States v. Crews, supra.

The fingerprint standards, which were taken from the defendant on the field strip during the course of his illegal stop and detention, were properly suppressed. However, so much of the order which suppresses the defendant's "fingerprints" and "fingerprint standards" is too broad and should not include pre-existing latent fingerprints or fingerprint standards which are obtained independent of the illegal stop, whether they are currently in existence or will be taken in the future.
Additionally, in Hayes v. State, 488 So.2d 77, 79 (Fla. 2d DCA 1986), the court noted:
We conclude that under Schmerber, there is neither a fourth amendment, fifth amendment nor sixth amendment violation of [sic] a compelled submission to fingerprinting when the individual is otherwise properly in custody or it is otherwise carried out with dispatch.
We hold it was not error for the trial court to have ordered the subsequent fingerprinting of appellant.

III
The third issue is whether the trial court erred in denying appellant's special requested jury instruction on identification. We conclude it did not.
Appellant's special requested jury instruction read as follows:
Identification
The State of Florida must prove beyond a reasonable doubt, that the crimes charged in this case were actually committed. But more than that, the State of Florida must also prove beyond a reasonable doubt, tha (sic) the Defendant, CURTIS THOMAS, committed the crime. If you are not convinced beyond a reasonable doubt that it was the Defendant, CURTIS THOMAS, who committed the crimes, you must find him not guilty. *247 (See, United States v. Telfaire, 469 F.2d 552 (D.C. Cir.1972).
The trial court denied the request stating:
THE COURT: All right. I am going to, with some reluctance, deny that because it is already covered on Page 12 and for the appellate record, here is the way I always read it:
I say, "The crimes with which the Defendant is charged were, in fact, committed and
"Number two: The Defendant is, in fact, the person who committed the crimes."
I always emphasize that and I think you will acknowledge that, won't you?
MR. DUNCAN: Yes, sir, I sure do.
THE COURT: So that gives you plenty of thunder to get up there and argue, so I am going to deny your special jury instruction Number 2.
The trial court actually charged the jury as follows:
The Defendant in this case has entered his plea of not guilty. This means that you must presume or believe the Defendant is innocent. The presumption stays with the Defendant as to each and every material allegation of the Information, through each stage of trial until it has been overcome by the evidence, beyond and to the exclusion of every reasonable doubt.
To overcome the Defendant's presumption of innocence, the State of Florida has the burden of proving the following two elements:
Number one: The crime with which the Defendant is charged was, in fact, committed and
Number two: The Defendant is, in fact, the person who committed the crimes.
The Defendant is not required to prove anything.
Whenever the words reasonable doubt are used you must consider the following:
A reasonable doubt is not a possible doubt, a speculative, imaginary or forced doubt. Such a doubt must not influence you to return a verdict of not guilty if you have an abiding conviction of guilt.
On the other hand, if after carefully comparing, considering and weighing all the evidence there is not an abiding conviction of guilt or if having a conviction it is one which is not stable but which wavers and vacillates then the charge is not proved beyond every reasonable doubt and you must find the Defendant not guilty because such a doubt is a reasonable doubt. It is to the evidence introduced upon this trial and to it alone that you are to look for such proof.
A reasonable doubt as to the guilt of the Defendant may arise from the evidence or it may arise from a conflict in the evidence or it may arise from a lack of evidence.
If you have a reasonable doubt, you must find the Defendant not guilty. However, if you have no reasonable doubt, you should find the Defendant guilty.
Then the judge instructed:
The Constitution requires the State to prove its accusations against the Defendant. It is not necessary for the Defendant to disprove anything nor is the Defendant required to prove his innocence. It is up to the State of Florida to prove the Defendant's guilt by evidence.
It is clear from a review of the instruction actually read that the substance of the requested instruction was covered. While it is true that a defendant is entitled to a jury instruction on the theory of his defense if there is any evidence to support it, it is not reversible error to refuse a charge if it was covered by the general charge. See Bailey v. State, 411 So.2d 1377 (Fla. 4th DCA 1982) (trial court did not err in denying defendant's requested jury instruction where it added nothing to standard instructions).
DOWNEY, J., and WETHERINGTON, GERALD T., Associate Judge, concur.